**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br> CLEO AI, INC., a corporation,<br><br>    Defendant. | Case No. 1:25-cv-02594-ALC<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.    The FTC brings this action for Defendant's violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403.  For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b and ROSCA, 15 U.S.C. § 8404.

**SUMMARY OF CASE**

2.    Cleo AI, Inc. operates a personal finance mobile application and promises consumers instant or same-day cash advances of hundreds of dollars.  When consumers attempt to obtain a cash advance, the application presents consumers with two subscription services, Cleo Plus or Cleo Builder.  Cleo charges a monthly subscription fee for both subscriptions, and requires consumers to connect a payment method from which it collects the cash advance repayment, subscription fees, and other fees, as necessary.

3.    But Cleo does not deliver on its promises. Cleo promises instant or same-day cash advances, such as a "$250 spot" and up to $250 for Plus consumers, and up to $500 for Builder

consumers. However, internally Cleo's policies limit cash advances to below the advertised amounts. For example, Cleo limits the amount first-time customers can receive to $100. Moreover, almost no one receives even close to the advertised dollar amount. For example, during the period of time between when Cleo first began advertising $250 cash advances and when Cleo received notice of the FTC's investigation, only 0.3% of Plus consumers who obtained an advance received $250. Overall, most Plus consumers receive under $45, and most Builder consumers receive under $60.

4.      Cleo also falsely promises that consumers can obtain cash advances "today" or "instantly." Rather than providing the product advertised – an instant or same-day advance – Cleo provides a cash advance that could take days to arrive. In fact, to guarantee cash "today" consumers must pay an additional fee, and even then, the advance might not arrive until the next day.

5.      Dissatisfied, consumers try to cancel their Cleo Plus or Cleo Builder subscriptions. But Cleo makes it difficult for certain consumers to cancel their subscription. For example, until late-2023, Cleo prevented consumers with an outstanding cash advance balance from canceling their subscription until the cash advance was fully repaid, forcing consumers to pay additional monthly fees for a subscription that they did not want.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

7.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (c)(1), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

**PLAINTIFF**

8.      The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, which prohibits unfair or deceptive acts or practices in or affecting commerce.  15 U.S.C. § 45(a).  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-05, which prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements to protect consumers. A negative option is an offer in which the seller treats a consumer's silence—their failure to reject an offer or cancel an agreement—as consent to be charged for goods or services. 16 C.F.R. § 310.2(w).

**DEFENDANT**

9.      Defendant Cleo AI, Inc. ("Cleo"), is a Delaware corporation with its principal place of business in New York.  Cleo transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, Cleo has advertised, marketed, distributed, or sold access to its platform to consumers throughout the United States.

**COMMERCE**

10.      At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANT'S BUSINESS ACTIVITIES**

11.      Cleo offers cash-advance services through its personal finance mobile application (the "App") which is available on the Apple App Store and Google Play Store.  Cleo advertises

the App as offering consumers instant or same-day delivery of hundreds of dollars.

12.    The App describes two subscription plans, a $5.99/month subscription plan called Cleo Plus ("Plus") and a $14.99/month subscription plan called Cleo Builder ("Builder").

13.    Monthly subscription fees, cash advance repayments, and any other fees are automatically debited from consumers' accounts at a later date.

**Cleo's Deceptive Advertisements About Cash Advances**

14.    Cleo advertises instant or same-day cash advances of hundreds of dollars to consumers.

15.    For example, a Cleo video advertisement compares Cleo to competitors and offers in all capital letters a "$250 SPOT."  The advertisement goes on to stress that unlike its competitors who provide "funds in 2-3 business days" Cleo provides "quick access to funds."



16.     A video advertisement depicts a consumer no longer needing to seek a loan from a friend and states that the advance will be received "instantly."



17.     Another video advertisement depicts a consumer in denial that her "bank balance doesn't have enough money to cover [her] bills" and then announces consumers can get up to $250 "today."



**Representations During Cleo's Application Process Regarding Advance Amounts, Timing, and Repayment**

18.     Cleo makes similar promises about the amount and timing of cash advance to consumers who sign up through the App.

19.     For example, after consumers open the App, Cleo announces, "UP TO $250 IN CASH ADVANCES" and a large blue button prompts consumers to "Sign up."



20.     The App takes consumers who tap the "Sign up" button through a series of steps in which Cleo collects the consumer's personal information and bank account information.

21.     After the App connects to consumers' accounts and collects what it labels "income basics," Cleo presents two subscription plans on a screen titled "Plans."



22.     The "Plus" plan is preselected and a large blue button labeled "Continue to Plus" guides consumers to move through the signup process.

23.    Once a plan is selected, Cleo prompts consumers to connect their "income account."



24.    During this process Cleo uses an artificial intelligence risk classifier scoring system to determine whether to offer a cash advance to consumers, and how much to offer.  This is based on the details provided by the consumer, including their bank account information.  Cleo

withholds the determined cash advance amount from consumers, only informing them whether they are "eligible for an advance."

25.     Next, consumers are prompted to set up payment of their monthly fee, of $5.99/month or $14.99/month, and then the following screens appear.

*Plus*                                                                                          *Builder*



26.    Only after the consumer subscribes to the Plus or Builder, consumers provide their billing information, and Cleo sets the payment date for the subscription, does Cleo inform consumers the cash advance amount they can actually receive.  And for almost all consumers, that amount is much lower than the amount promised in Cleo's ads:

| *Plus* | *Builder* |
|--------|-----------|

 

27.    The next screen has a button to receive the funds "Today."

*Plus*                                                    *Builder*

 

28.    On the same screen, Cleo requires consumers to enter a debit card to receive and repay advances.

**Cleo Does Not Provide the Promised Cash**

29.    Despite its promises, Cleo institutes internal policies that contradict Cleo's advertisements and offers only a miniscule number of its customers cash advances close to the advertised amounts.

11

30.    For example, even after Cleo began advertising advances of up to $250 for Plus consumers around March 2023, Cleo continued to limit the amount of cash available for first-time consumers to $100.

31.    Since Cleo began advertising $250 cash advances around March 2023 to when Cleo received notice of the FTC's investigation, only 0.3% of Plus consumers who received an advance qualified for the advertised $250.

32.    No Builder consumer gets the advertised $500 after applying and paying for Builder.  Instead, consumers have to take extra steps, including: (a) applying and being approved for a Builder Cleo credit card and (b) setting up a direct deposit from consumers' payroll to Cleo. Even then, prior to when Cleo received notice of the FTC's investigation, only about 0.01% of Builder consumers who took the extra steps got $500.

33.    Most Plus consumers get under $45 and most Builder consumers get under $60. Internally, Cleo employees discussed the misleading nature of its advertisements.  For example, when advertisements referred to $100, internal chats discussed that advertisements were getting the "usual folk[s] convinced it guarantees $100."

34.    One employee asked if Cleo is "able to look at disclosing salary [cash] advance amounts before taking money from people?" but quickly added "now that I've asked this question I will go hide in a bunker … 😂."

35.    In nearly all cases, Cleo never discloses the cash advance amount before the consumer subscribes to, and pays for, the Plus or Builder.  At times, Cleo stated in a combination of smaller font, lighter colors, or at the bottom of screens that the cash-advance amount offered may be below the advertised amounts.  For example, at the bottom of the page in the enrollment screen shown in paragraph 21, Cleo states that advance amounts "range from $20-$250, and $20-

$100 for first-time users."  But even this or similar statements were not consistently included in versions of the enrollment process including a version from after the FTC contacted Cleo.

36.    Consumers have reported to Cleo their confusion and disappointment about the small sums Cleo actually offers.  For example:

- "And also you said *you give 250 advance so you hook people thinking they will get that* and then swipe them for [ ] monthly hidden fee membership that doesn't help at all."

- "Bu[t], you said 250.00 . . . If you don't go over 40.00 just say that.  I am Retired Military . . . ."

- It stated I was eligible for $35.  That was the most.  I also need to look into raising that because I paid $6 for this app[,] and it didn't tell me what I was eligible for . . . *if I knew it would be so low I wouldn't have signed up.*"

- "*Cleo says the biggest advance I can get is $30 . . . . I won't ever use this service if it isn't 100% as advertised.*  I guess I was misled . . . . Wouldn't have signed up for that in a million years had I not been misled from the advertising."

- "If I had known more detail about these limits *I would have done things a little differently*."

37.    As one consumer summarized regarding an earlier advertisement promising $100: "*I was lured into signing up for this service in order to receive a cash advance for $100*.  Well, once they got my money, they told me . . . that they could not advance me the hundred dollars which they had *lured me under false pretenses*."

**Cleo Charges Extra Fees for the Advertised Instant or Same-Day Cash Advances**

38.    Cleo's advertisements offer fast money, promise Cleo is there to provide cash for an "emergency," and ensure payment "today" or "instantly," but Cleo actually charges a fee to get the cash "today," and even then, the cash may not arrive until the next day.

39.    As late as 2024 Cleo oscillated between including and not including a footnote on the screen in paragraph 21 that stated, "Same day transfers subject to express fees."  Even when

the footnote did appear, it was in smaller, lighter letters than other text on the screen and could not cure the deceptive net impression of the original advertisement.

40.    After consumers subscribed to a Plus or Builder, shared their payment information, and applied for a cash advance, Cleo presents the "Your Advance" screen in paragraph 27, which purportedly allows consumers to select a button to get their payment "Today." Below the claim, unbolded language reiterates the timing promise, by saying "Most arrive within minutes." Only after that does Cleo state, in unbolded language contradicting the "Today" claim, that money might arrive the next day. And only after that does Cleo state that to get the money "Today" or the next day, consumers have to pay an extra, previously undisclosed fee ranging from $3.99 to $9.99.

41.    Most consumers select the "Today" option and then end up paying what a consumer described as a "BOGUS HIDDEN fee" which has, at times, accounted for more than a third of Cleo's annual revenue.

42.    For consumers, this is a one-two punch:  first, confusion when they learn Cleo charges for expedited disbursements at all, then anger and frustration when left stranded after relying on Cleo's promise of money "today." For example, some consumers have stated:

- "***Why did I get charged an additional $3.99*** by Cleo after I paid back what I owe them for the $25 when I'm paying $5.99 already for subscription."

- "But I do want to know ***why I was charge[d] $3.99 on top of my re payment and my $5.99 subscription.***"

- "***You're pr[e]ying on the poor people that need a helping hand*** . . . you were going to charge them to subscribe, ***then you're gonna charge them to get it instantly*** which is not so innocent . . . ridiculous."

- "Hi.  I just subscribed and paid for IMMEDIATE 35 dollars.  ***Now I go on here and it says up to 24 hrs.  I have my son today and he needs food and I need gas to go get it.  I can't wait 24 hours, or I wouldn't have bothered.***"

14

- "There's no other way for me to say it.  I need my money right now to pay my rent.  I have no other option I can't wait 3 days.  *I can't wait 1 day I need it now. I would never have used Cleo if I would have thought I would ever be in this situation.*"

- "I didn't know it's not instant.  *I felt robbed, cause I'm wa[i]ting to eat* . . . been working on finding funds all day."

- "If my advance doesn't go to my bank account today, *I would like a refund* . . . . I need the advance for bills today, and *if the advance is not instant, as advertised, then there is no point in using this app*."

- "*I thought the $3.99 was so it would be instantly deposited.*  Not to mention paying my last $6 for the subscription when you guys advertise that u can get a HUNDRED INSTANTLY only to find out I can only get $20 which now that I'm out my $6 only covers my gas home if I skip dinner [] *and now I have to wait 24 hrs*."

43.     A conversation among employees reveals that, after discussing consumer complaints, it was internally confirmed payments could take 24 hours, which might not be same-day.  Another internal conversation shows that as early as March 2021, a Cleo employee reported "Cleo's auto-replies still say this '[t]here are 2 pay out options when getting a Salary Advance.  If you chose an Express Payout for $3.99, you will get it within the same day.'"  She then questioned if this is "incorrect because it takes 24 hours?"  Yet Cleo continued its deceptive "Today" or "instantly" claims, and consumers continue to express confusion and dissatisfaction with Cleo's expedited fee.

### Cleo Fails to Provide a Simple Mechanism for Consumers With Outstanding Cash Advance Balances to Stop Recurring Charges

44.     After consumers realize the terms of Cleo's products, they attempt to cancel.  But consumers with outstanding cash advance balances find that Cleo makes it difficult and often impossible to cancel their Plus or Builder subscriptions.  This practice has forced these consumers to rack up unwanted monthly subscription fees.

45.     Until at least late 2023, Cleo did not permit consumers with an outstanding cash

15

advance to cancel their subscriptions through the App.

46.     If these consumers tried to cancel the Plus or Builder subscriptions, and they reached out to Cleo's customer service, Cleo told them that consumers could not cancel subscriptions until the full cash advance was repaid.  Cleo customer service representatives often told customers that the "system" would not allow cancelations or that they were "unable to cancel" the subscription.  Customer service representatives also frequently told consumers they could not cancel because "[y]ou still have an active loan" or that "a subscription is unable to be canceled when an Advance is active or overdue."

47.     As a consumer explained the experience, "***I have requested over and over and over to cancel my account and you refuse to***[,] and then deduct another month out of my account after I have requested you cancel my subscription."

48.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission for the reasons discussed above and because, among other things:

     a.     Defendant has engaged in unlawful acts and practices repeatedly over a period of years;

     b.     Defendant earned significant revenues from participating in these unlawful acts and practices;

     c.     Defendant continued its unlawful acts or practices despite numerous complaints including complaints that identify the unlawful nature of its actions; and

     d.     Defendant remains in the cash advance subscription business and maintains the means, ability, and incentive to continue its unlawful conduct.

**VIOLATIONS OF THE FTC ACT**

49.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

50.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**Count I:  Misrepresentations Regarding Cash Advances**

51.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its cash advance services, including through the means described in Paragraphs 11 to 47, Defendant represents, directly or indirectly, expressly or by implication, that by enrolling in Defendant's subscription products:

      a.  consumers will receive, or are likely to receive, a specific cash advance amount; or

      b.  consumers will receive the cash advance from Defendant "today" or "instantly."

52.     In fact, in numerous instances in which Defendant has made the representations described in Paragraph 51, such representations were false or misleading or were not substantiated at the time the representations were made.

53.     Therefore, Defendant's representations as described in Paragraph 51 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

54.     In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear,

17

accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

55. Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (2) obtains the consumer's express informed consent before making the charge, and (3) provides a simple mechanism to stop recurring charges. 15 U.S.C. § 8403. A term of the transaction is "material" when it is likely to affect a consumer's choice of, or conduct regarding, goods or services.

56. The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

57. As described in Paragraphs 11 to 47, Defendant advertises and sells Cleo services through a negative option feature as defined by the TSR. 16 C.F.R. § 310.2(w).

58. Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is treated as a violation of a rule promulgated under the FTC Act regarding unfair or deceptive acts or practices.

### Count II:  Failure to Provide Clear and Conspicuous Disclosures

59. In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 11 to 47, Defendant has failed to clearly and conspicuously disclose

18

before obtaining consumers' billing information all material transaction terms, including the following:

    a.      that Defendant offers cash advances at or near the amounts advertised to very few consumers; and

    b.      that consumers do not receive advances instantly and might not obtain cash advances "today" unless they pay an additional fee.

60.     Therefore, Defendant's acts or practices, as described in Paragraph 59, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

**Count III: Failure to Provide Simple Mechanisms to Stop Recurring Charges**

61.     In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 11 to 47, Defendant has failed to provide simple mechanisms for a consumer to stop recurring charges to the consumer's credit card, debit card, bank account, or other financial account.

62.     Therefore, Defendant's acts or practices, as described in Paragraph 61, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

## CONSUMER INJURY

63.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and ROSCA. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA;

19

B.    Award monetary and other relief within the Court's power to grant; and

C.    Award any additional relief as the Court determines to be just and proper.

Dated:  March 27, 2025                    Respectfully submitted,

                                          ADAM SALTZMAN
                                          MAYA SEQUEIRA
                                          SALLY TIEU
                                          JAMES DOTY
                                          JAMIE D. BROOKS
                                          Federal Trade Commission
                                          600 Pennsylvania Avenue, N.W.
                                          Mailstop CC-10232
                                          Washington, D.C. 20850
                                          Phone: (202) 538-1038 (Saltzman)
                                                 (202) 717-0369 (Sequeira)
                                                 (202) 326-2088 (Tieu)
                                                 (202) 326-2628 (Doty)
                                                 (202) 621-3912 (Brooks)
                                          Email:  asaltzman1@ftc.gov
                                                  msequeira@ftc.gov
                                                  stieu@ftc.gov
                                                  jdoty@ftc.gov
                                                  jbrooks4@ftc.gov

                                          Attorneys for Plaintiff
                                          FEDERAL TRADE COMMISSION

20